[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 342 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 343 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 344 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 345 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 346 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 347 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 348 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 349 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 350 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 351 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 352 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 353 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 354 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 355 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 356 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 357 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 358 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 359 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 361 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 362 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 363 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 364 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 365 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 367 
The plaintiff alleges that at the time of the commencement of the actions by the People against the Erie Railway Company for its dissolution, and by the Farmers' Loan and Trust Company for the foreclosure of the mortgages upon its property, it owned a large amount of stock and bonds in other corporations which were not covered by or subject to the mortgages; and he seeks now to reach that property and to subject it to the payment of certain unsecured obligations which he and other creditors, similarly situated, then held and still hold against the Erie Railway Company. He finds in his pathway the orders and decrees made in the actions mentioned which must be brushed aside or disregarded before he can succeed. He does not allege in his complaint that any fraud was practiced upon the court or any party to the action, and he does not assail those orders and decrees as in fact fraudulent and seek to have them vacated or annulled on that account. He does not claim that if the court had jurisdiction, as against him and the other general creditors, to make them, that he can attack them collaterally or maintain this *Page 368 
action. What he claims is that those orders and decrees, so far as they assumed to adjudicate upon or dispose of the property in question, were made without any jurisdiction and may, therefore, be disregarded, and that they furnish no obstacle to the maintenance of this action. Hence the general inquiry upon which we are to enter is whether the Supreme Court had jurisdiction to adjudicate upon and dispose of the property by the orders and decrees made in those actions.
About the 25th day of May, 1875, the People's action was commenced for the dissolution of the Erie Railway Company upon the ground, among other things, that it was insolvent, and had been for one whole year; and the complaint in that action, besides other relief, prayed that Hugh J. Jewett, who was then president of the company, might be appointed receiver during the pendency of the action. On the twenty-sixth day of May he was so appointed with power, as provided in the order appointing him, among other things, to prosecute and defend actions for or against the company, either in the name of the company or in his own name as receiver, and to maintain and preserve the corporate organization and franchises of the company until final judgment in the action. Thereafter application was made in that action on behalf of the Farmers' Loan and Trust Company for leave to commence an action against the Erie Railway Company to foreclose the mortgages held by it. Such leave was granted, and on the 14th day of June, 1875, the foreclosure action was commenced in the Supreme Court. In the prayer for judgment in that action the plaintiff, besides other relief, prayed that an inquiry might be had and an account taken of and concerning the premises and property mortgaged to the plaintiff in order that it might be fully and at large ascertained whereof the mortgaged premises consisted, and that Jewett might be appointed receiver in the action. On the fifteenth day of June, by an order duly granted, Jewett was appointed receiver, in that action, of the mortgaged property, and he was specially authorized to receive and enforce possession of whatever he was bound to receive, to run and *Page 369 
operate the railway, to institute, as he might deem needful, whatever suits or proceedings he by counsel might be advised to be necessary and proper in the appropriate discharge of his duty as receiver, and to defend and resist any suit or proceedings which he should be so advised and should believe would otherwise be prejudicial to the property, interests or franchises committed to his charge, and generally to do and cause to be done in a lawful manner as receiver, what might be reasonable and needful in and about the care and preservation of the rights, interests and franchises on which the mortgages were a lien, or the discharge of his duty as receiver might render needful. These orders appointing Jewett receiver, and all the other orders in the two actions, were made in the same court, the same judge presiding, and thereafter Jewett must be deemed to have taken and held as receiver in the foreclosure action all the property covered by and subject to the mortgages and, as receiver in the People's action, all the other property of the company.
On the 6th day of April, 1876, upon an affidavit and notice of motion, an order was made by the court in the foreclosure action that the receiver should hold and deal with the stocks and bonds in question in all respects as a part of the general fund of the estate embraced in the mortgages, among other things, for the reimbursement to the plaintiffs in that action of all sums paid under the orders of the court out of the proceeds of the mortgaged premises for the discharge of debts due from the Erie Railway Company, at the date of the receiver's appointment, for labor and supplies, "without prejudice to any equitable rights and interests of the respective parties which may be established on final accounting," and he was also authorized to sell any part of the stocks or bonds at public or private sale and to use and apply the proceeds for the purposes of the trust.
The foreclosure action proceeded to judgment on the 7th day of November, 1877, which judgment recited that the bonds and stocks lawfully came into the possession of the receiver, and that they were held by him as part and parcel of the property and premises mortgaged to the plaintiff; and it *Page 370 
authorized the referee appointed to sell the mortgaged premises, to expose for sale and to sell as part thereof the stocks and bonds mentioned which were described in the decree as a portion of the mortgaged premises; and they were sold by the referee. The sale was afterward confirmed and the referee was authorized to convey the stocks and bonds with the other property, and he made such conveyance; and the Erie Railway Company executed a similar conveyance of the same property. Afterward, upon the petition of Jewett in the foreclosure action, an order was made by the court on the 3d day of May, 1878, by which it was ordered that the receiver deliver to the New York, Lake Erie and Western Railroad Company, "all the property and franchises whereof he is now possessed as receiver in this action, and which were embraced or intended to be embraced in the judgment of foreclosure herein, subject to the reservations and exceptions hereinafter specified, and subject to all and singular the rights of the people of this State in and to the premises, or any part thereof, as the same may be ascertained on due inquiry and examination by the attorney-general, in the action of the People of this State against the Erie Railway Company, now pending, to the end that such rights and interests may be as fully protected as if this transfer had not been ordered and directed." In pursuance of that order and upon the terms thereof, he did make the delivery, and that substantially terminated the proceedings in the foreclosure action.
But for the pendency of the People's action, it cannot be doubted that the determination and judgment in the foreclosure action would have been conclusive upon every one. It was within the province of the court to determine what property was actually embraced within or subject, in express terms, or by subrogation or any other equitable principles, to the mortgages foreclosed.
The unsecured creditors were not necessary or proper parties to that action and had no right to intervene therein, and any adjudication made against the mortgagor was binding upon them. (Bronson v R.R. Co., 2 Black [U.S.] 524; *Page 371 Stoute v. Lye, 103 U.S. 66; Candee v. Lord, 2 N.Y. 269.) Jewett as receiver in the People's action was not a necessary party to that action. As temporary receiver he was not vested with the title to the property of the corporation; it was not divested of its property until final judgment of dissolution and the appointment of the final receiver. The temporary receiver was not a trustee for the creditors of the corporation, but he was a mere care-taker, custodian and manager of its property and franchises, under the direction of the court, during the pendency of the action, having lawful possession of the property; and if a trustee in any sense, he was a trustee for the corporation Nor were the People in any sense a proper party to that action. They had no lien upon or interest in the property. The main purpose of their action was to procure a judgment dissolving the corporation, and any other relief they could obtain was incidental to that. The court could have permitted the People or the receiver in their action to intervene in the foreclosure action, if application had been made for that purpose, but whether it would or not, rested in its discretion.
The foreclosure judgment absolutely determined that these stocks and bonds were subject to the morgages and liable to be sold with the mortgaged premises. They were so sold, absolutely, the sale was confirmed and the referee was ordered to make the conveyance, including these stocks and bonds, to he purchasers and all this was done without any violation of the rights of the general creditors. The title of the purchasers under the foreclosure sale was in no way made subject to the rights of the People in their action until an order was made, subsequently to the conveyances by the referee and Railway Company to the purchasers, for a delivery of the property by the receiver; and in that order it was for the first time provided that the delivery should be subject to all the rights of the People as they might be ascertained by the attorney-general in the People's action; and the delivery was so made.
The adjudications made in the foreclosure action absolutely bound all the parties thereto, and none of them could thereafter *Page 372 
be heard to say that they were not founded upon sufficient evidence. The Supreme Court having general jurisdiction of the parties and the subject matter is conclusively presumed to have had sufficient facts before it to authorize the judgment and the orders which were made, and neither the Erie Company nor any of its general creditors can now be heard to say that the judgment was not pronounced after full examination and investigation of all the facts upon which it was based. It imports absolute verity, and it must be presumed that these stocks and bonds were properly subject to the mortgages and were properly sold in connection with and as a part of the mortgaged property. (Grignosis, Lessee, v. Astor, 2 How. [U.S.] 319.) Where a court having jurisdiction of the subject matter and the parties pronounces judgment upon insufficient or illegal evidence, or mistakes the evidence or the law, the only remedy of any person aggrieved by the judgment is by an appeal therefrom or a motion in the action in which it was rendered; but it cannot be assailed collaterally. Therefore whatever rights the plaintiff has in this action grow out of the commencement and pendency of the People's action against the Erie Company, and such, indeed is the contention of his learned counsel.
It cannot be claimed that the pendency of the People's action, in which a temporary receiver had been appointed, absolutely prohibited the commencement of the foreclosure action. That action was commenced after leave was regularly obtained by an order of the court made in the People's action. In the action for the dissolution of the corporation, the court was not bound to appoint a temporary receiver. It could have permitted the action to proceed to judgment, and then appointed a final receiver to be vested with the title of the corporate property, and with power to administer and distribute such property under the direction of the court. The temporary receiver was entirely under the control of the court. There was no statute regulating or prescribing his duties. He was what was called in the argument a common law receiver, with such powers and duties as in the exercise *Page 373 
of its equitable jurisdiction the court might devolve upon him. His duties were in the main to manage, protect and preserve the property and franchises of the company during the pendency of the action. The People's action could have been discontinued at any time by the order of the court, and the receivership vacated and set aside, and the property restored to the corporation, and thus fully subjected to the action of the court in the foreclosure action. The whole matter was constantly under the control of the court until final judgment. Therefore, the court had the power to permit the foreclosure action to be commenced and to proceed, to appoint a receiver therein and to supersede the receiver appointed in the People's action, to transfer all the duties of the receiver in that action to the receiver appointed in the foreclosure action and to order all the property covered by the mortgages to be delivered to such receiver. The judgment in the foreclosure action appears to have been regularly obtained. There was service of process upon, and appearance by the Erie Company, and an answer admitting the allegations of the complaint. That answer entitled the plaintiff to judgment against it.
But it appears in the record that the attorneys for the Erie Company, more than two years after the commencement of the foreclosure action, consented to the entry of the judgment therein, and this, it is claimed, rendered the judgment absolutely void against the final receiver in the People's action, and the creditors of the corporation under section 71, 2 Revised Statutes, 469, which provides as follows: "All sales, assignments, transfers, mortgages and conveyances of any part of the estate, real or personal, including things in action of every such corporation made after the filing of the petition for dissolution thereof, in payment of or as security for any existing or past debt, or for any consideration, and all judgments confessed by such corporation after that time, shall be absolutely void as against the receiver, who may be appointed on such petition, and as against creditors of such corporation." That section was aimed, not at the disposition *Page 374 
of the corporate property made under the order of the court by its receiver, or even by the corporation, but at the voluntary disposition of its property by the insolvent corporation; and the confession of judgment prohibited was one made by the corporation as its voluntary act without the interference of the court, and not a judgment like this which rests upon no confession, nor even consent, but upon the action and order of the court at a regular term and session thereof. Such a judgment is in no sense a judgment by confession. If, therefore, it be assumed that section 71 was applicable, it was not violated.
The People's action was one in equity under the Revised Statutes (2 R.S. 463, § 38), which provides as follows: "Whenever any incorporated company shall have remained insolvent for one whole year, or for one year shall have neglected or refused to pay and discharge its notes or other evidences of debt, or for one year shall have suspended the ordinary and lawful business of such corporation, it shall be deemed to have surrendered the rights, privileges and franchises granted by any act of incorporation, or acquired under the laws of this State, and shall be adjudged to be dissolved." That section was unrepealed in 1875, and it is conceded that under it, as originally enacted, an action could be brought in equity for the dissolution of a corporation in the cases mentioned, that in such an action, both a temporary and final receiver could be appointed, who would be common law receivers possessing the powers and charged with the duties devolved upon them by the orders of the court in the exercise of its equity jurisdiction, that they would not be controlled by the provisions of law which regulated the appointment of receivers in the case of the voluntary dissolution of corporations under part 3, chapter 8, title 4, article 3 of the Revised Statutes, and that if the Code which was in force in 1875, did not operate upon receivers appointed in actions commenced under that section, then all of the proceedings in the People's action and the foreclosure action were so far regularly conducted within the jurisdiction of the court that the plaintiff is in no position to *Page 375 
assail them. But his contention is that while the temporary receiver appointed in the People's action was a common law receiver, whose powers and duties were not regulated by statute, yet that when Jewett became a final receiver in that action, his powers and duties then became subject, under the Code, to the statutory provisions referred to; and for the present we will proceed upon that assumption.
Upon that assumption, then, what could be done under the authority and direction of the court by Jewett, as temporary receiver, in both actions, before judgment and his appointment as final receiver in the People's action? He had such powers and duties as temporary receiver as the court conferred upon him. He could manage, control and care for the property of the corporation, and, until final judgment in the People's action, the general creditors of the corporation had no right to notice and no absolute right to intervene, or to a hearing. The receiver could reduce the property to possession without consulting them; he could manage the railways under the order of the court and incur and discharge debts, sell and buy property in the ordinary business of the company; and he could bring and defend actions without any notice to or right of interference by the general creditors. If, after his appointment as receiver in the People's action, he had found a large amount of the assets of the company in the possession of adverse claimants, he could have commenced suits therefor, either in his own name or that of the company, and if he had failed in the suits, and judgment had gone against him, the adjudications would have bound the creditors of the Erie Company. If he or the Erie Company had been sued for a debt, a judgment in the suit would have bound the creditors of the company. Here, before final judgment, there was a claim made on the one side by the holder of the mortgages that these stocks and bonds belonged to it under the mortgages and that they were in equity part of the mortgaged estate. On the other hand, the People claimed that they were not covered by the mortgages and could not properly be sold under the foreclosure judgment or transferred to the purchasers on the foreclosure *Page 376 
sale; and the People claimed that the purchasers under that sale did not get good title, and thus there was a controversy as to this property. That was a controversy which the court had a right to determine before judgment like any other controversy respecting the property in the hands of its receiver. It appointed a referee to investigate the facts and to report thereon. An apparently thorough and exhaustive investigation was made in which the people, through their attorney-general, participated, and as a result of it, the court determined that these stocks and bonds did come under the mortgages, that they were properly sold with the mortgaged premises, that the purchasers at the foreclosure sale obtained a good title to them, and that they never, in fact, came to the possession of the receiver appointed in the People's action. So far no statute was violated and no statutory right of the general creditors was disregarded. They were represented in the litigation by the People and by their debtor, and any judgment rendered or decision made was binding upon them as it was binding upon the actual parties to the litigation. The court was not bound to defer that litigation until a final receiver was appointed, but had the right to permit it to proceed to a conclusion before final judgment in the People's action. The fact that Jewett was receiver in both actions makes no difference. We may assume, for the purpose of testing the matter, that there was a different receiver in each action, and that they both claimed this property and that there was thus a controversy to be settled. It cannot be doubted if such had been the case that the court would have had jurisdiction to permit one receiver to sue the other for the purpose of settling the controversy, and that a decision made in such a litigation would be binding upon everybody.
It matters not that this controversy and litigation involved all the assets of the corporation which were not plainly covered by the mortgages. The same principles must rule whether the amount involved was large or small. If the receivers could under the direction of the court engage in a litigation over a single steam engine, or over a debt of *Page 377 
$100,000 for or against the corporation, and bind the corporation and its creditors by the result, upon precisely the same principles he could engage in this litigation to which the people and the corporation were also parties and bind the corporation and its creditors by the result.
There was no distribution of the assets of the corporation in violation of the rights of the final receiver, or of its general creditors. It was judicially determined that these assets were subject to the mortgages, and that was a determination, as we have seen, which the court could make without the presence of the general creditors except as they were represented by the People. The final receiver when appointed was vested with all the estate which the corporation had at the time of its dissolution, and these stocks and bonds which had been swept away by the mortgage foreclosure and sale were no part of that estate. The rights which the statutes secure to creditors in the case of a statutory final receiver of an insolvent corporation are such only as pertain to the property which comes to the receiver to be administered by him and distributed to creditors; and there is no statute which entitles them to notice or gives them the right to a hearing before the receiver except as to claims upon and their rights in such property.
There never was a time when the general creditors of the corporation had any vested right in these stocks and bonds or to be paid out of them, and the disposition made of them did not impair the obligation of their contracts with the Erie Company or deprive them of due process of law.
It is claimed on behalf of the plaintiff that the title of the final receiver related back to the commencement of the People's action and that, therefore, it overrode the disposition made of these stocks and bonds. But the equitable rule which gives a receiver title to the debtor's property, by relation as of the commencement of the action, is one adopted to defeat fraudulent, unwarranted and unjust dispositions of the debtor's property and to accomplish just and equitable ends; but it is not applicable to a case where property has been *Page 378 
legally disposed of under the direction of the court, and certainly has no application to a case like this where the property claimed for the final receiver was subject to a lien in favor of mortgage creditors and has been sold and disposed of by virtue of that lien during the pendency of the action.
There is a feature of this case which must be here more particularly noticed. After the termination of the foreclosure suit and the sale and transfer of the mortgaged premises to the new corporation, the New York, Lake Erie and Western Railroad Company, the latter company executed a new mortgage to the Farmers' Loan and Trust Company to secure a large amount of its bonds. After the final order of reference, among other things, to ascertain whether these stocks and bonds were covered by or subject to the lien of the mortgages, in March, 1879, the People's action was discontinued as to all parties defendant except the Erie Railway Company and the Farmers' Loan and Trust Company, and by leave of the court obtained in that action a supplemental complaint was served alleging the foreclosure proceedings and the sale and transfer under the foreclosure judgment, and other matters. To that complaint the Farmers' Loan and Trust Company in its answer thereto also alleged the foreclosure proceedings insisting upon the validity of the sale therein made and its title to these stocks and bonds under its mortgage. To this answer the attorney-general, on the 3d day of April, 1879, served a reply in which he denied that these stocks and bonds were embraced within the mortgages, and alleged that they were improperly, wrongfully and unlawfully included in the foreclosure judgment, in the sale thereunder and in the deeds to the purchasers at such sale, and denied that they or the Farmers' Loan and Trust Company acquired any title thereto. Thus an issue was framed by the parties to that action to be tried and disposed of before the referee appointed for that purpose. Even if final judgment could have been entered in the action before the trial and disposition of that issue, how can it be said that the parties and the court could not delay the entry of final judgment, until after the trial of that issue? It was *Page 379 
an issue framed before judgment, which it was quite proper to try before judgment, and the decision of that issue, embodied in the final judgment upon the report of the referee, that the bonds and stocks were covered by and subject to the mortgages and were legally transferred under the foreclosure sale, bound all the parties to that action and the persons who were represented by them. The People and the Railway Company represented the general creditors of the Railway Company and the Farmers' Loan and Trust Company represented the bondholders whose trustee it was.
Hence upon the assumption that the final receiver appointed in the People's action was clothed with the powers and subject to the duties of receivers in the case of the voluntary dissolution of corporations precisely as claimed by the learned counsel for the plaintiff, yet we reach the conclusion that during the pendency of that action and of the temporary receivership, the court had jurisdiction to make the orders and decrees complained of and to authorize the disposition which was made of this property.
But we need not stop here. Even if the reference to, hearing before, and decision by the referee Spencer had been after final judgment in the People's action, and the appointment of Jewett as final receiver with all the powers of a receiver in the case of the voluntary dissolution of a corporation, still our conclusion would be the same. Prior to the Code of Procedure, final receivers appointed in equitable actions, under section 38, were common law receivers, whose powers and duties were not regulated by statute (Mann v. Pentz, 3 N.Y. 415); and this is conceded by the learned counsel for the plaintiff. But he claims that the law was changed by that Code, and that in consequence of the provisions thereof the powers and duties of final receivers under section 38 were the same as were devolved upon a final receiver appointed in the case of the voluntary dissolution of a corporation. The Code, as originally reported and enacted in 1848, contained no provisions in reference to the winding up or dissolution of corporations, and section 38 remained unaffected. But in 1849, *Page 380 
section 430 of the Code was added, which provides as follows: "An action may be brought by the attorney-general, in the name of the people of this State, on leave granted by the Supreme Court, or a judge thereof, for the purpose of vacating the charter or annulling the existence of a corporation, other than municipal, whenever such corporation shall,
"1. Offend against any of the provisions of the act or acts creating, altering or renewing such corporation; or,
"2. Violate the provisions of any law, by which such corporation shall have forfeited its charter, by abuse of its powers: or,
"3. Whenever it shall have forfeited its privileges or franchises, by failure to exercise its powers; or,
"4. Whenever it shall have done or omitted any act which amounts to a surrender of its corporate rights, privileges and franchises; or,
"5. Whenever it shall exercise a franchise or privilege not conferred upon it by law.
"And it shall be the duty of the attorney-general, whenever he shall have reason to believe that any of these acts or omissions can be established by proof, to apply for leave, and upon leave granted, to bring the action in every case of public interest, and also in every other case in which satisfactory security shall be given, to indemnify the people of this State against the costs and expenses to be incurred thereby."
And then by section 444 it was provided that when judgment should be rendered against a corporation the court should have the same power to restrain the corporation, to appoint a receiver of its property and to take an account and make distribution thereof among its creditors as was given in article 3, title 4, chapter 8 of the third part of the Revised Statutes, and that it should be the duty of the attorney-general, immediately after the rendition of such judgment, to institute proceedings for that purpose. By section 68 of the Revised Statutes referred to, it is provided that such receivers shall have the power and authority conferred by law upon trustees to whom an assignment of the estate of insolvent debtors may be *Page 381 
made, pursuant to the provisions of the fifth chapter of the second part of the Revised Statutes. Section 70 provides that the receivers, immediately on their appointment, shall give notice thereof, which shall contain the same matters required by law in notices of trustees of insolvent debtors; and in addition thereto shall require all persons holding any open or subsisting contract of such corporation, to present the same in writing and in detail to such receivers at the time and place in such notice specified, which shall be published for three weeks in the State paper and in a newspaper printed in the county where the principal place of conducting the business of such corporation shall have been situated. In section 72 it is provided that after the first publication of the notice of appointment of receivers, every person having possession of any property belonging to such corporation, and every person indebted to such corporation, shall account and answer for the amount of such debt and for the value of such property to the receivers; and all the provisions of law in respect to trustees of insolvent debtors, the collection and preservation of the property of such debtors, the concealment and discovery thereof, and the means of enforcing such discovery, shall be applicable to the receivers so appointed and to the property of such corporation. Section 73 provides that such receivers shall have the same power to settle any controversy that shall arise between them and any debtors or creditors of such corporation by a reference, as is given by law to trustees of insolvent debtors; that the same proceedings for that purpose shall be had, and with like effect; that application for the appointment of referees may be made to any officer authorized to appoint such referees on the application of trustees of insolvent debtors, who shall proceed therein in the same manner, and that the referees shall proceed in like manner and file their report with the like effect in all respects. Section 74 provides that the receivers shall be subject to all the duties and obligations by law imposed upon trustees of insolvent debtors, so far as they may be applicable, except where other provisions shall be made; that they shall call a general *Page 382 
meeting of the creditors of such corporation within four months from the time of their appointment, when all accounts and demands for and against such corporation, and all its open and subsisting contracts, shall be ascertained and adjusted as far as may be, and the amount of moneys in the hands of the receivers declared. Section 79 provides how the receivers shall distribute the residue of the moneys in their hands among those who shall have exhibited their claims as creditors, and whose debts shall have been ascertained. Section 85 provides that the receivers shall be subject to the control of the Court of Chancery, and may be compelled to account at any time, and may be removed by the court. Section 90 provides that any decree or order of the Court of Chancery, made upon any petition presented pursuant to the provision of that article, or in the course of any proceedings therein, shall be subject to an appeal. By looking at the fifth chapter of the second part of the Revised Statutes (2 R.S. p. 41), we find that in section 7, it is provided that the trustees shall have power to sue in their own names, or otherwise, and to recover all the estate, debts and things in action belonging or due to the debtor, in the same manner and with the like effect as such debtor could or might have done if no attachment had been issued, or trustees appointed, or an assignment had not been made; and, among other things, to settle all matters and accounts between such debtor and his debtors or creditors, and to examine any person touching such matters and accounts on oath, and to compound with any person indebted to such debtor and discharge all demands against such person. Section 8 provided that the trustees, immediately upon their appointment, shall give notice thereof, and therein shall require, (1) all persons indebted to such debtor by a day and at a place therein to be specified, to render an account of all debts and sums of money owing by them respectively, to such trustees, and to pay the same; (2.) all persons having in their possession any property or effects of such debtor, to deliver the same to the trustees by the day so appointed; (3.) all the creditors of such debtor to deliver their respective accounts and demands to the trustees *Page 383 
or one of them by a day to be therein specified, not less than forty days from the first publication of the notice. Section 19 provides that if any controversy shall arise between the trustees and any other person in the settlement of any demands against such debtor or of debts due to his estate, the same may be referred to three indifferent persons, who may be agreed upon by the trustees and the party with whom such controversy shall exist by a writing to that effect signed by them. Section 26 provides that the trustees shall, as speedily as possible, convert the estate, real and personal, of such debtor into money; and section 27 provides that the trustees, within fifteen months from the time of their appointment, shall call a general meeting of the creditors of such debtor by a notice to be published in the same manner as before directed respecting the publication of the notice of their appointment, in which notice they shall specify the time and place of such meeting, which time shall not be more than three months, nor less than two months after the first publication of such notice; and every such notice shall be published at least once in each week until the time of such meeting. Section 28 provides that at such meeting, or other adjourned meeting thereafter, all accounts and demands, for and against the estate of such debtor, shall be fairly adjusted, so far as the same can be ascertained, and the amount of moneys in the hands of the trustees declared; and further sections provide for the distribution of moneys in their hands. Section 46 provides that such trustees shall be subject to the orders of the Supreme Court, and of the Court of Common Pleas of the county in which they were appointed, upon the application of any creditor, or of any debtor in respect to whom they were appointed, in relation to the execution of any of the powers and duties confided to them; and they may be removed by the Supreme Court for cause shown. From this careful reference to the statutes, upon the assumption that they are applicable, it will be seen that there is nothing in them which requires a final receiver to consult the general creditors of the insolvent corporation in the prosecution or defense of any action. He is required to publish certain notices and to call *Page 384 
a meeting of the creditors that their claims may be adjusted and the balance of the property in his hands, after the adjustment of the claims, may be determined. But it is shall his duty to take into his possession the insolvent's estate and to use the legal means for that purpose, and he may commence and settle suits and, under the direction of the court, compromise claims, and he is subject at all times to the order of the court. In this case there was a controversy as to the ownership of this property, and as to whether it came to Jewett in the People's action or as receiver in the foreclosure action, and that was a controversy to be settled under the direction of the court; and by a reference and investigation and an orderly legal proceeding, it was determined that the property did not come to him as receiver in the People's action, but that it came to him as receiver in the foreclosure action; and that as receiver in the Peoples' action he had no title or claim thereto, and that the same was properly sold and disposed of in the foreclosure action. There is no provision of law which required that the general creditors should be made parties to that litigation, or have any notice thereof; and none of their legal rights were violated by carrying the same on without any notice to them. They were represented therein by the People through the attorney-general, and by the receiver, and by the defendant, the Erie Railway Company. They could undoubtedly have been permitted to intervene or to appeal from the judgment or any of the orders, if any ground of appeal existed. But they had no right to attack the same collaterally unless for fraud sufficient within the rules applicable to such cases to sustain an action to set aside a fraudulent judgment. These provisions as to notice by the receiver were mostly directory, and were not essential to the jurisdiction of the court. Their omission would constitute an irregularity against which any party aggrieved could have relief by application to the court in the proceeding or in the action. They had reference to the settlement of the claims against the debtor and the distribution of the debtor's property among creditors. But they had no pertinency whatever *Page 385 
until the estate should come into the hands of the receiver for distribution by him among those entitled to share therein.
Therefore, standing upon the very ground taken by the plaintiff, assuming the fundamental law to be precisely as he claims, yet we are unable to perceive how it can be said that the court did not have jurisdiction to make the final adjudication which was entered in the final judgment in the People's action. And if we are right in this conclusion, then there is no ground for the maintenance of this action.
But the magnitude of the interests involved in this action is such as to justify us in fortifying our conclusions by still further prolonging this discussion; for, if the court had no right in the foreclosure action, in consequence of the pendency of the People's action and the temporary receivership therein, to determine whether these stocks and bonds were covered by or subject to the mortgages, then, for precisely the same reason, it had no right to determine what property was covered by the mortgages or how much was due thereon, and all the foreclosure proceedings are open to the collateral assaults of this plaintiff and other creditors.
We are of opinion that the learned counsel for the defendants are right in their claim that the proceedings in equity under section 38, for the dissolution of a corporation for the reasons therein stated, were unaffected by the Code of Procedure. It was provided in section 13 of title 2 of chapter 18, part 3 of the Revised Statutes (2 R.S. 579) that a writ of scire facias might be issued out of the Supreme Court upon the relation of the attorney-general against any corporation created or renewed by any act of the legislature, for the purpose of vacating or annulling such act on the ground that the same was passed upon some fraudulent suggestion or concealment of a material fact made by the persons incorporated by such act, or made with their consent or knowledge. That was contained in the article entitled "Of scire facias." Section 27 provided that whenever any judgment should be rendered for the vacating and annulling of any act of incorporation pursuant to the provisions of that article, the *Page 386 
Court of Chancery should have the same powers to restrain the corporation created by such act, to appoint a receiver of its property and effects, and to take account and make distribution thereof among its creditors, as were given in the third article of the fourth title of the eighth chapter of that act, relating to the voluntary dissolution of corporations; and that it should be the duty of the attorney-general, immediately after the rendering of any judgment vacating and annulling any such act of incorporation, to institute proceedings for that purpose. Article second of the same title is entitled "of information in the nature of quo warranto, and in certain other cases," and section 39 provided as follows: "An information in the nature of a quo warranto may also be filed by the attorney-general upon his own relation, on leave granted, against any corporate body whenever such corporation shall (1) offend against any of the provisions of the act or acts creating, altering or renewing such corporation; or (2) violate the provisions of any law by which such corporation shall have forfeited its charter by misuser; or (3) whenever it shall have forfeited its privileges and franchises by non-user; or (4) whenever it shall have done or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises; or (5) whenever it shall exercise any franchise or privilege not conferred upon it by law. And it shall be the duty of the attorney-general to file such information, in every instance in which he shall have good reason to believe that the same can be established by proof." Section 49 provided that whenever it should be found or adjudged that any corporation against which an information in the nature of a quowarranto should have been filed, had by any misuser, non-user or surrender, forfeited its corporate rights, privileges and franchises, judgment should be rendered that such corporation be ousted, and altogether excluded from such corporate rights, privileges and franchises, and that the corporation be dissolved. And section 51 provided that whenever any such judgment should be rendered, the Court of Chancery should have the same *Page 387 
powers to restrain the corporation created by such act, to appoint a receiver of its property and effects, and to take an account and make distribution thereof among its creditors, as were given in the third article of the fourth title of the eighth chapter of that act, and that it should be the duty of the attorney-general, immediately after the rendering of any such judgment, to institute proceedings for that purpose. It is thus seen that there were two systems of procedure which might be carried on against insolvent corporations, or corporations which had done or omitted any act which amounted to a surrender of their corporate rights, privileges or franchises. One was a suit in equity by the attorney-general of his own motion without leave of any court under section 38 above referred to, in which a temporary receiver, and, after final judgment, a final receiver could be appointed, each of whom would possess such powers and duties as might be devolved upon him by the court uncontrolled by any statutory regulations. The other was a proceeding instituted by writ of quo warranto by the attorney-general after leave obtained of the court, which was a proceeding at law in which the corporation was entitled to a jury trial; and in that proceeding judgment could be rendered dissolving the corporation. The Supreme Court had no right to appoint a receiver, but after final judgment annulling and dissolving the corporation, the attorney-general was required to apply to the Court of Chancery for the appointment of a final receiver, and his powers and duties were regulated by the provisions contained in article three above referred to in reference to the voluntary dissolution of corporations. These two systems of procedure against corporations went along side by side, one in chancery and the other at law. Now what change did the Code of Procedure work? Section 38 was not repealed by that Code, but was expressly saved by section 471 thereof, and remained in force in 1875, when the People's action was commenced. The chapter of the Code which embraced section 430 was entitled "actions in place of scirefacias, quo warranto, and of information in the nature of quowarranto," and the title is quite *Page 388 
a clear indication that that chapter was not intended to take the place of article 2, title 4, chapter 8, part 3 of the Revised Statutes which contained section 38, and which was entitled "of proceedings against corporations in equity." Section 428, the first section of the Code chapter, provides that the writs ofscire facias and of quo warranto are abolished, and that "the remedies heretofore obtainable in those forms may be obtained by civil actions under the provisions of this chapter," and section 429 provided, in substance, the same as was provided in section 13 of chapter 9 of the Revised Statutes above mentioned, simply substituting an action in the place of the writ of scirefacias. Section 430 of the Code above set out is substantially the same as section 39 of the same chapter of the Revised Statutes, and was evidently intended to take its place; and section 431 provides that leave to bring the action mentioned in the preceding sections may be granted upon the application of the attorney-general. Section 432 is a substantial re-enactment of section 28 of chapter 9, and section 442 of the Code is substantially like section 49 of chapter 9; and section 444 is a substitute for sections 27 and 51 of the same chapter.
It is, therefore, we think, quite clear that the chapter of the Code was simply intended to substitute actions in the form prescribed by the Code in the place of writs of scire facias
and quo warranto, and to regulate the proceedings in such actions. But there was nothing in that chapter which took away from the court of equity the general power which it had always possessed, and which it had previously exercised under section 38, in actions for the dissolution of corporations for the reasons stated in that section, or which subjected the receivers appointed in such an action to the provisions of section 444 of the Code.
The actions commenced under section 430 of the Code, like those commenced by writ of quo warranto under section 39 of the Revised Statutes, for which it was a substitute, continued to be strictly legal actions in which the defendants had the constitutional right of jury trial, and neither a temporary *Page 389 
injunction could be issued nor a temporary receiver appointed. Section 444 made special provision for injunctions and receivers after judgment, and thus forbade them by implication at an earlier stage of the action. The maxim expressio unius exclusioalterius applies.
But this construction of the Code of Procedure is made still clearer by a reference to the present Code. By the repealing act, chapter 245 of the Laws of 1880, section 38 of the Revised Statutes was for the first time repealed, and section 1785 of the Code was substituted in its place. Section 1786 provides that the actions specified in the last section may be maintained by the attorney-general in the name of, and in behalf of the People. Section 1788 provides for the appointment of a temporary and permanent receiver in such an action; and by that section and the repealing act of 1880, the duties and powers of a permanent receiver so appointed were made the same as those of receivers in the case of the voluntary dissolution of corporations under the Revised Statutes. The sections to which we have referred, sections 1785, 1786 and 1788, are contained in article 3 of title 2, chapter 15 of the Code, and actions under that article could be commenced without leave of the court. Then in article 4 provisions are made for the commencement of actions by leave of the court, and those provisions are substantially like those contained in the Code of Procedure, and which, before that Code, were contained in that part of the Revised Statutes which related to writs of scire facias and quo warranto against corporations. When judgment has been rendered in an action provided for in that article, the final receiver is subject to the powers and duties which devolve upon receivers of corporations voluntarily dissolved, and all the actions under that article are triable by jury.
So it appears that the two systems of procedure against corporations which were provided in the Revised Statutes have been continued since the enactment of the Code. Under the one system the actions may be commenced without leave of the court, and they must be tried as equitable actions. Under the *Page 390 
other system the actions can be commenced only by leave of the court, and the parties are entitled to jury trial as matter of right. Under the present Code, for the first time, under both systems, by special provisions, a temporary injunction may be issued and a temporary receiver may be appointed during the pendency of an action, and the final receivers are subject to the provisions of law applicable to receivers in the case of the voluntary dissolution of corporations, whose powers and duties are regulated by law. Under the Revised Statutes when equitable and legal remedies were administered in different courts, there was reason for the existence of the two systems. But now, when all the remedies may be administered in the same court, it is difficult to perceive any reason for the continued existence of the two systems. But they do exist, and each must have its proper significance and operation.
We think, therefore, that it is clear that prior to 1880 there was no statute regulating the powers and duties of receivers appointed in the equitable actions commenced under section 38 of the Revised Statutes above referred to.
We have taken no notice of the act chapter 151 of the Laws of 1870, to which our attention has been called, for the reason that that act has no pertinency to any questions involved in this case. It did not extend injunctions and receiverships to new cases. It simply provided that they should be issued and granted in actions, and regulated the practice so as to prevent abuses which had previously been just cause for complaint.
There are other topics brought to our notice in the learned briefs submitted to us. They have not been overlooked; but the necessities of time and space forbid any attention to them here. We have written enough to show that the plaintiff does not by the facts alleged in his complaint set forth a cause of action against the defendants, and that the judgment should therefore be affirmed.
All concur, except FINCH and PECKHAM, JJ., dissenting.
Judgment affirmed. *Page 391